For the Appellant and Cross-Appellees, Michael Riesis, R.E.S.I.S., from Smith-Owens. Good morning, Your Honors. Michael Rassak, I'm here on behalf of the plaintiff's athlete, John, and I gather it's Maggie. Okay. As the clerk notified you, Justice Sloan is not able to be here today, but we'll listen to the arguments online and fully consider it before any decision is rendered. We generally give around 15 minutes, 10 and 5 for the appellant and 15 for the appellee that meets with your approval. We don't have anything afterwards, so if we go a little bit long, we go a little bit long. Okay? Fair enough. Thank you. Thank you. Okay. Please proceed. Good afternoon, and may it please the Court, Counsel. My name is Mike Riesis, and I'm here today on behalf of R.A.S. Development as Appellant, Cross-Appellee, and State Farm as Cross-Appellee. R.A.S. appeals from the judgment entered upon the jury's verdict in plaintiff's favor for about $3.286 million. The parties have briefed a number of issues, but today we wish to focus on three. First, whether plaintiff's suit against R.A.S. Development was time-barred or related back under 2616D. Second, whether R.A.S. was entitled to judgment notwithstanding the verdict under Section 414 of the Restatement Second. Third, whether R.A.S. was entitled to a new trial as a result of trial error when R.A.S.'s contractually retained responsibility for safety. On any of these grounds, we respectfully submit the judgment below cannot stand. First, plaintiff's action against R.A.S. was time-barred and did not relate back under 2616. The accident took place on August 28, 2000. R.A.S. was not named until February 20, 2007, nearly six and one-half years later. Plaintiff did not claim a misnomer and relied exclusively on relation back. Plaintiff, however, did not show compliance with 2616D. Now, at one time, 2616D contained five requirements for an amended pleading to relate back. Three of those requirements do not appear in the current version, which became effective on January 1, 2002. The current version is aligned with federal practice. The statute now requires that the defendant, and here are the important words, quote, knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against him or her, close quote. That is the key phrase. Plaintiff had to show that the failure to name R.A.S. was, quote, a mistake concerning the identity of the proper party, close quote. Otherwise, the Second Amendment complaint, which first named R.A.S. in 2007, did not relate back to the original complaint filed in 2002. Not every mistake a plaintiff makes concerns the identity of a proper party. A plaintiff's realization after the expiration of the limitation period that another party could have been sued is not a mistaken identity. 2616D is not a fallback provision for a plaintiff who does not discover the identity of a defendant within the limitation period. Here there is no mistaken identity. The plaintiff intended to sue the parties named in the original complaint, including the property owner, R.A.S. I'm sorry, the property owner, Wolfram Towers, and one of its partners in the project, R.A.S. Wolfram. No mistake there. But didn't R.A.S. Wolfram come in and admit in their answer to the complaint that it was, in fact, the general contractor? They did, in fact, make that answer. Is that a mistake? That may have been a mistake, but that was not a mistake attributable to us. They had separate counsel. Lawyer-wise, but in terms of the R.A.S., these are related entities, right? Yes. The three men, I don't know what their names came from. No, no, you're right. R.A.N.S., Robert and Saul. Justice Levin, you're right. Okay. You're right. So when they were sued, Wolfram Towers and R.A.S. Wolfram. Yes. And they answered the complaint, didn't they, in fact, specifically, even though the complaint didn't say you're the general contractor, didn't they specifically answer that Wolfram Towers was the general? Correct. But here's the essential point, Justice Levin. Even when plaintiffs knew of the existence of R.A.S. and knew of its role as general contractor in the project, they continued to maintain the suit against both R.A.S. Wolfram and against Wolfram Towers. Plaintiff was not in the position of saying, I mistakenly sued the Wolfram entities instead of R.A.S. development because when they amended their complaint in 2006 to add R.A.S. development, they continued the suit against those two entities. It's not a case of mistaken identity when you simply add another party that you believe might be liable to you, and that is what we have here. If the case law suggested that the focus was on what the plaintiff knew and whether the plaintiff was entirely diligent in acting on that knowledge, I might be there with you, but the case law seems to say quite the opposite. Well, now you're talking about Krupski, and maybe this is a good point in the argument to talk about Krupski for a moment. Krupski came down during briefing in this case. It came down after we filed our opening brief. Krupski does not say that a plaintiff's knowledge, what the plaintiff knew and when the plaintiff knew it, is irrelevant. It didn't say that. What Krupski says is that what plaintiff knew and when the plaintiff knew it is relevant to a defendant's understanding whether or not it reasonably believed that there was a mistaken identity or just an error on the plaintiff's part in not knowing who to sue. So the plaintiff's knowledge is, in fact, relevant, but it's relevant when it's wrapped into the question of what the defendant knew and whether what the defendant knew amounts to a mistake in identity about the proper party. And here we would submit that when the plaintiff continued to maintain the suit against those other Wolfram entities, in addition to RAS development, this is not a case of mistaken identity, not a case of mistaken identity. Justice Levin, you have referred to the fact that there was an answer filed by one of the Wolfram entities that raised this issue about RAS, I'm sorry, about Wolfram being the general contractor. And then later there was an interrogatory that said the opposite. Yes. And that's exactly, you read my mind, exactly. If you look at what the plaintiff also knew, the plaintiff knew from answers to interrogatories in May of 2003 that RAS was the general contractor. The plaintiff also would have gotten that same information in December 2003 when the construction manager, Lance Chalsey, testified in his deposition that RAS was the contractor and plaintiff's counsel, a very experienced lawyer, in a question referenced the fact that RAS was the general contractor. And what we are suggesting is that when they have this knowledge by December 2003 at the latest, but we don't get named, no RAS development entity gets named until the First Amendment complaint almost three years later, that we don't have here a mistake in identity as the federal decisions have applied that term after Krupski. And while we certainly have to acknowledge that Krupski came down during briefing, you also have to look at the decisions that have interpreted Krupski. And those decisions, some of which are cited in our reply brief, and if you shepherdize those cases, it's easy to find some other cases as well, make it clear that a plaintiff's lack of knowledge about the role that a party has in a litigation is not a mistake in identity. A mistake in identity is a very narrow exception to 2616D. Well, how is the plaintiff in Krupski not mistaken about the identity of the proper cruise company to sue? Great question, Chris. Here's what we're talking about. In Krupski, we have a situation where there are two defendants, both with similar sounding names, related to each other. And the plaintiff was essentially saying, I sued Cruise Line A. I think the name of it was Costa Cruise was the one that they originally sued and Costa Crochier was the one they wanted to sue. They had similar names and the plaintiff intended to sue one for the other. We don't have a situation here where plaintiff sued Wolfram Towers and RAS Wolfram instead of RAS Development. Because at one time, all of them were in the case, unlike Krupski, where there was never a time when both of them were in the case. One was supposed to be a substitute for the other. In our case, we're simply another party. Would you acknowledge that in terms of who it was that plaintiff intended to sue, regardless of the name, that it was the general contractor? I would have to acknowledge that they certainly, if you just look at the complaint. The construction incident case. Absolutely. They were intending to sue the general contractor. Now, what that doesn't mean, though, is that they have an open-ended period of time in which to discover who the general contractor is. They do have to comport with the requirements of 2616. If it's a mistaken identity, then presumably they sued Party A when they intended to sue Party B. I read their brief and I'm still trying to figure out who they were really intending to substitute RAS Development for because they continued to suit against those two other entities. So who were they substituting? They were ultimately non-suited, weren't they? They were non-suited after the First Amendment complaint was filed and before the Second Amendment complaint was filed in December of 06. Correct. They were not dropped in favor of RAS Development. They were dropped because, as it turned out, the plaintiff couldn't make a case against them. Well, would you also acknowledge, though, that during this period of time from when RAS Development's identity as the general contractor was disclosed and then the later date when they finally got sued, there was an important document that had never been turned over? I would not agree to that because they had a number of important documents that identified RAS Development, including the contract between Rockford Construction, which was the plaintiff's employer, and RAS, which identified RAS as the contractor. And they produced that document, as Judge Taylor had noted in his original decision, in February of 03. They had everything they needed. They sued everybody under the sun in the original complaint. They had everything they needed at that time. Weren't there a number of documents that misidentified the general? There were a number of documents. You are correct, Justice Sterber. There were a number of documents that were somewhat inconsistent in how they referred to RAS. You are correct. Like building permits? Yeah, absolutely, absolutely. You know, I don't think there's anything all that unusual, though, about that. I mean, that happens from time to time. And they had the time. And if they thought it was really a case of mistaken identity, they could have dropped those other parties instead of keeping them in the case along with RAS Development. They certainly had the information to make that change. Yes. They certainly had the information to make that change at any time. But didn't your clients, you know, by virtue of what you're saying here now, weren't they possessed of the same information that, you know, there but for their mistake, we should have been, you know, the other entity should have been sued? Well, okay. Didn't Mr. Levin know that? I have to concede that Levin as an agent or as a partner would have known of the lawsuit. Okay? He would have known of the lawsuit. That does not mean that if he knows of the lawsuit that he necessarily has no reason to believe that just because he knows of the lawsuit doesn't mean that there's a mistake in identity is what I'm trying to say. Okay? I guess I'm trying to figure out those. How would they be prejudiced if it turns out that, you know, they've just named the wrong one of our several related entities? Where is the prejudice to them versus, you know, a procedural windfall if they get let out of a case because of a mistake like this? By the time we were named, all of the fact discovery had been done. No one had represented RAS Development at any of the depositions of the fact witnesses. The plaintiff's expert deposition had been taken in July of 2006. Basically, by the time we are finally named in the case, all of the written discovery has been done. All of the fact discovery has been done. The plaintiff's expert's deposition has been taken. Wasn't your insurance company the same? Weren't you getting all these reports from Insurance Council? It's true that they had. It's true that Wolfram Towers and RAS Wolfram and RAS Development had the same insurance company. But that doesn't mean that Wolfram Towers and RAS Wolfram is looking after the interests of RAS Development at these depositions. They have plenty to do defending themselves without having to defend someone else who has not yet been named in the case. And by the time we were named in the case, they're on their way out. No one's there representing our interests, as I said, at the fact and the expert discovery. Second, away from the 2616 issue, and we submit that the trial court had erred in granting plans motion to reconsider, we respectfully submit that RAS was entitled to judgment now withstanding the verdict on two grounds. First, plaintiffs did not show that RAS contractually retained control, supervisory control, of Rockford's work under 414. The contract provisions here are standard AIA contract provisions, which were discussed in Joyce v. Mastery, which you can find on pages 29 and 30 of our opening brief, and Cochran and Shaughnessy, among other cases, discussed on pages 14 and 15 of our reply brief. Under the contracts, plaintiff's employer, Rockford, was to take all reasonable safety precautions. RAS was prohibited from giving directions or orders directly to Rockford employees. Rockford was to provide all labor, material, and equipment to complete the work, and Rockford was responsible to keep the premises free of debris. Moreover, the record shows that RAS did not actually exercise supervisory control of the means and methods of Rockford's masonry work. That is the buzzword, the magic word. The supervision must affect the means and methods of the work, or there's no 414 liability. RAS did not affect the means and methods of the work. The record shows, beyond dispute, Rockford supplied all of the tools, equipment, and material. RAS never instructed Rockford or plaintiff on how to do the work. Rockford determined the means and methods of performing the work for itself. Rockford held safety meetings. RAS did not have a safety manual. RAS relied on the subcontractors to initiate their own safety in the work areas. Rockford never asked RAS to get involved in safety. Who was their safety superintendent? It would be, well, the person who was the construction manager was Lance Schalze, and the provision that you're referring to in the main contract, the prime contract, about the construction superintendent, if anyone was hired to fulfill a role, it would have been Schalze, but as Shaughnessy and Cochran make very clear, just because there is an AIA provision that says you're supposed to have a construction superintendent on the site doesn't automatically impose 414 liability. You have to affect the means and methods. The difference I would suggest is that you have an owner, Mr. Levin, who says Schalze is my safety guy, and then you've got Schalze who says I ain't no safety guy. I don't know anything about safety. I'm an architect, and I didn't have safety meetings, and, you know, I never went to their floor where they were working. So I think you have some questions of fact here that the jury heard about, you know, who was in charge of safety, and was there anybody on this job for the general contractor who was really fulfilling that role? Schalze is there to monitor the work, to make sure that the work is done in accordance with the specifications, and certainly to see the progress of the work. He said he wasn't there for safety, and Levin never said that Schalze is my safety guy, and he's there to exercise control of safety. Now, I will say this. There is a general right. I will say this. There are cases, and we've cited them, Shaughnessy and Cochran among them, that talk about a general right to safety oversight, a general right to stop the work, which is a normal contractual right, but that does not equate with the means and methods, of the work under 414. But aside from that, and you have to bear in mind that you have something else going on here, and that is the fact that the third floor where the work was taking place is a controlled access floor. It is a floor that is off limits to the other trades. It's off limits to the general when the work is being done because of the hazardous nature of the work. And this goes into the second question under 414, and that is whether RIS would have had notice of a hazardous method of performing the work. Now, here I think the evidence is undisputed. First notice is a precondition. The plaintiff concedes that they had shown notice. The record shows that it was a controlled access zone. Overhand bricklaying is recognized in the construction industry and OSHA as an appropriate method of laying the bricks. Chelsea, the construction manager, never observed Rockford doing the work in an unsafe manner. Only Rockford employees were on the third floor at the time of the accident, and even plaintiffs retained opinion with this. Philip Colloran admitted that RIS should not have been on the floor while Rockford was working, and RIS had no way of knowing where the plaintiff was working near the edge of the open floor when he fell. Unless we are required to be omnipresent, RIS was entitled to judgment, notwithstanding the verdict, based on the failure to show notice under 414. We'll give you more time because I am bugging you here a little bit. You're not bugging me, but I guess I have been looking at the clock because I wanted to cover everything. We're okay timely. Don't worry about it. All right. I want to make sure you get to the third issue that you wanted to bring up and get a full opportunity to do that. The one question I have on your last point is on the question of notice. Yes. Do you want to get some water? Well, I just wanted to get my drink. Okay. On the question of notice, the man fell through a partially under construction window opening. Am I right? Correct. And there were similar window openings on lower floors throughout this project. Am I right about that? I can't say that certainly at one time in sequence. I'm not too sure on the day of the accident if they were true, but certainly at one time. The question that I have, I think it came up in Mr. Schalze's testimony, where he believed that there were cross braces or some kind of guardrails in these window openings while the project was going on, but he wasn't 100% sure that they were up as of the date of the accident. Do you recall that testimony? Well, I do recall there was testimony that there was cross bracing on the scaffold that would have been according to the testimony. I'm not talking about the scaffolding. I'm talking about some kind of braces or guardrails to prevent somebody from falling through a window opening. I don't remember that testimony. I do remember that after the accident, the city of Chicago did order certain guarding to be put into the openings and plaintiff relies on it. You folks put that up and then they take it down? After. And then Rockford takes it down. So who has the control there? Right? We're told to put it in. They take it out. Right. But before the accident, I'm not aware. That was all done after the accident. Okay. Sorry for the interruption. No, that's what we're here for. Third and finally, I want to go to the trial error concerning the opinion testimony because it does tie into the second issue concerning the 414 liability. We submit respectfully that RAS was entitled to a new trial when the court repeatedly, over objection and in violation of a motion of limine that we had made that the judge had denied, allowed plaintiff to elicit incompetent testimony and legal conclusions that RAS retained control and responsibility for safety. Now, I would like to think that the parties, if they could agree, and nothing else in this case could agree, that a witness is not competent to give testimony amounting to an interpretation of contractual duties or legal conclusions. Here, over objection, the trial court allowed plaintiff to elicit incompetent testimony from Robert Levin and Philip Colloran, his own witness, calling for an interpretation of the contracts regarding retained responsibility for safety. We put that testimony in our brief on pages 42 through 44. And although I know it is bad form to read from a brief, for the most part, if I could, just read a couple of these questions and ask whether or not these are really proper questions. And if the contract documents give instructions concerning methods or means or techniques, you're still responsible for evaluating job safety. Objection overruled. The contract says you have a duty to protect Jerry Maggie. The contract says that. That's objection. Objection overruled. What's the answer, though, to the question? That's not the best question in the world. I mean, the two questions that you read, the first one doesn't make any sense, and the second one, he doesn't really answer it. Do you have a duty to protect Jerry Maggie? Answer, I can only tell you what the contract says. How could he give an answer that didn't call for an interpretation? If he says yes, okay, that's an interpretation of the contract. If he says no, that's an interpretation of the contract. And then the plaintiff used the fact that he was asked that question to then go back to their own retained witness, Philip Colloran, right, because, hey, if they get to ask Levin, why can't they ask Colloran? And then Colloran is allowed to testify over objection. Do those safety responsibilities that we know about in the subcontract relieve or exclude any responsibilities from the general RIS with respect to those safety issues and accident prevention? That, again, is calling for contract interpretation. Coyne v. Robert Anderson, a case that we have cited in our brief, makes it very clear. You can't ask your expert whether somebody was in charge of the work or in control of the work. That was a Structural Work Act case. The principle is the same. Either way. And we submit the error could only be prejudicial here. Why? Because the plaintiff is relying on Colloran's testimony about the contractual duties to justify the verdict. Now, as far as I can submit, the plaintiff can't have it both ways. They can't say, you know what, that question didn't make any sense. That really wasn't a very well phrased question. Or Colloran was just giving opinions. He wasn't really interpreting contracts. And then say, as they do on page 47 of their brief, oh, the verdict can be upheld because Colloran testified that we had the duty to intervene and correct the safety hazard. They can't have it both ways. They can't rely on it and then say, but it really wasn't very important. We submit the verdict was a product of that testimony. As to all other assignments of trial error, we'll stand on our brief. Mindful that oral argument is a privilege and not a right. We are grateful for the opportunity to address the Court today. And for all the reasons in our brief, we ask you to dismiss, enter judgment notwithstanding the verdict, or remand for a new trial. Thank you very much. Thanks, counsel. Good morning, Your Honors. As I said, Michael Rasek. I'm here on behalf of the plaintiff's appellee, John Maggie. I'll try to address the points in the same order that counsel did. And I'll try to be brief. Obviously, from the exchange, everyone understands the issues in the case. The question is where we go with them. The major issue that they raised is the 2616D relation back issue, obviously. The key thing there, as the Court has recognized, is that the rule has changed, and it's changed dramatically, and it's changed to be in line with the federal rule, which is the position that OES development has taken. And we know what the federal rule means because we've got the guidance from Justice Sotomayor, who said when you have this scenario, we don't look anymore at what the plaintiff knows. We look to see what the defendant knows. And in this case, the defendant in this case, because of the interlocking relationship, and more than that, the same people owned each of these companies, so that whatever you did when we sued Wolfram Towers, Mr. Levin and his two partners had to know. Mr. Levin was very frank about the relationship. I suspect these people were not hiding anything. They were people building buildings, and some lawyer said, here's what you do. Set these businesses up. As Mr. Levin admitted almost immediately, basically we hired ourselves. And if that wasn't the best admission I've heard from anyone, he was very frank about it. Yeah. If your colleague is correct, though, and we are to look at the plaintiff's knowledge and the plaintiff's activity or lack of activity, there would be some issues here, because it looked like there was some willful blindness on the part of plaintiff's counsel in adding somebody that they knew about from deposition, from interrogatory answers. Wouldn't you acknowledge that they sort of sat on that information for a while? I wouldn't agree with that. It becomes, if I have to use, if the plaintiff has to rely upon the old version of 2-616 rather than the current version, I have a much more difficult case to make. But we have a circumstance here where the court would then, I think, look to see whether what the plaintiff's counsel did was excusable. And in this case, we've got a situation where the documents produced don't show that RES development, and I'm trying to make sure I get the names right, was the general contractor. And that's who they needed to sue here. They had some of these documents, but the documents were very inconclusive as to who was who. And then when they did file suit within the statute of limitations, they get somebody who comes in and says, I am, they didn't say, we sue the general contractor. They said in their complaint, we're suing whoever is in charge of the work here. And Wolfram Towers came in and said, I'm the general contractor. That specific acceptance by Wolfram Towers, who is tied into the ultimate defendant, I am the general contractor, I suspect what happened is, why would they look further? If they had started looking at that point, but somebody said, I'm the general, why would we sue? Was that answer ever amended? It was. The answer was amended, but not until after the statute of limitations expired, so it didn't do us any good. Nor do we have the prime contract. The contract that they're talking about is the contract between RES development and Rockford. It refers to RES development as a contractor. But we don't want a contractor. The plaintiff wanted the general contractor. And we need the prime contract. That's apparently the only place that they actually use the word general contractor where it's clear. And we didn't get that until we got the letter long after the statute that said, by the way, we've made a couple of mistakes here. Ironically, and I think that's what the court was suggesting, they're saying it was improper for the plaintiff to make a mistake, but it wasn't the mistake when Wolfram Towers came in and said, we are the general contractor, thereby really misleading us. Anybody who's been in this situation, once somebody says, that's the person, I am the one you want, your focus turns to how do I prove that person, not what their status is. And counsel made the point, well, we didn't immediately dismiss the other defendants. We added, of course, RES development. And then, but we still had an interrogatory answer. That wasn't amended. That wasn't revoked. It said Wolfram Towers was the general contractor. Once it became clear that it was RES development, they were voluntarily dismissed. This is not a case, and counsel, I think, was intending to refer to the Pruitt case, where the plaintiff sued the building manager and said, I always intended to sue the building manager. They're always going to be in the case, oh, here's somebody else that it turns out I didn't sue. That's a different fact scenario. The notice, all that we have to show is that the proper defendant, I call them the target defendant. It's a word that tells me who I want. The target defendant had to know they were the one we were looking for. I would suspect in the background, their clients, the actual people on the construction site, to them, these defendants, these parties are all the same. Did it really matter to them who was going to be there? They all had the same insurance company. We know that. And for that reason, we believe Krupski, if nothing else, puts the final blow to everything, because the federal rule so closely matches the state statute. What about your colleague's suggestion that some of the cases after Krupski would place more emphasis than you do on the plaintiff's knowledge and activity? A twofold. One, if they did, they would be violating the Supreme Court case. And the district court cases, district court judges can do what they want, I guess, but they can't overrule the Supreme Court. And I looked at some of those cases, and they don't involve a scenario like this. The more typical scenario is a Pruitt scenario, where the plaintiff deliberately sues A and always wanted A, and then learns that somebody else, in addition, should be in the case to A. Or in one of the cases, I believe it was a police officer. They had no idea what was going on. They just didn't have the proper names in the case at all. But the Supreme Court case seems clear, and I would suggest that Paulides and Pruitt back up our point here as well. If I can just move on to the JNOV issue. The questions have indicated the court, of course, is aware that we have a contract here that gives RES development ultimate control over everything on the site. They were supposed to have a safety superintendent there. They did not. As to Mr. Schalze, Mr. Schalze admitted, agreed he could go up to this third floor. And Mr. Burnery, who is the head of Rockford Construction, said, sure, he can come up to this floor any time. If he pointed out a safety violation, we would fix it. And it's not a safety violation that was hidden. That's why we put the pictures in the back. You can see the scaffolds from down below. You know that the bricks have to get to the floor. Mr. Schalze, according to the argument this morning, Mr. Schalze was touring the site anyway because he was watching what was going on. This is the third or fourth of four buildings. They've been doing the same thing, according to the record, on all of the buildings. What they did wrong was they put the scaffold in prematurely. They don't need it until – they don't need the scaffold there because the scaffold is what the masons stand on in order to reach up. The scaffold doesn't need to be there because at this point the masons are down on their hands and knees. Jerry Magee has got to get the bricks right up to where the masons are because the masons work – anybody who's been in construction, the masons work with a quota. They've got to get so many bricks laid. They want the bricks right there so they can reach for them. Poor Jerry's got to get them there, but because of the scaffolds, he can't get them there. He's got to bring his cart over to the scaffolds. Now he's got to take them off the cart and start dragging them over to the edge. Let me make sure I have it correct because I thought I understood this. So you've got a scaffold, and let's say that the edge of the building is here and the scaffold is back here. Three feet. There are cross braces on the back, but he has to bring the bricks around the front. Correct. And in order to get them into the area under the scaffold, he would have to walk the bricks and the dolly or whatever he has in this mason's area where the mason is working in order to turn it and get it under the scaffold. He had them off the dolly at that point. That was the problem. He can't get the dolly through the scaffold because the scaffold's pretty deep. The front end of the scaffold closest to the wall has no braces. The back side has the braces. He's unable to get the dolly in there, so he's got to basically unload the dolly and then come around to the other side and pull it. And the problem is, and that's... And when he's doing that, is he in the area between the scaffold and the building edge? He's right at the margin at that point. His bricks were found underneath the scaffold in the photo in the back, but if he's pulling those bricks, if Your Honors look at the picture, you can see that he must be in that area. It's not going to work. And as Mr. Collier said, once you get into that area, if anything goes wrong at all, you will fall. That's why Mr. Collier on the fine that you need to put a barrier up there. And pretty much everybody acknowledged that he shouldn't have been in that area if he was in that area. That's correct. Including his bricklayer, Winchester. That's correct. And it's because of the way they set it up that he had to be there. It seems like the danger should be evident to anybody who's there. So you're going to work over there, and your job is going to involve pulling these huge piles of bricks. If anything goes wrong at all, in this case, the snap went. You can just, anybody who's done work knows what's going to happen next. You're going to go backwards, and that's unfortunately what he did. And there was no bracing. There was nothing. If they're going to have him do it, then Mr. Collier said you have to put a barrier up there. Their defense was, well, we couldn't put a barrier there because that was where he fell, that's where there was going to be a window. But Mr. Collier pointed out that the only mason working there was off to the side, so they could have actually had a barrier there. And if I can switch to their final point, which was Mr. Collier's testimony, Mr. Collier said he relied upon the contracts and the depositions and his own background as an expert in this area. I would submit to the court, and I think we explained it in a brief, he really did not interpret the contract documents. But the cases that RES cites don't say, do not say that an expert cannot interpret a contract document. They say an expert can't interpret a statute, an expert can't interpret a code, and if there's no dispute about what the contract means, it stands on its own. But if there is an implication of the Joyce cases or the Christou cases, that if there is a dispute, then the expert is welcome to take a look and say, in my experience, and in the cases counsel cites, the expert wasn't an expert in that area. Here we have a contract, a construction expert, who would be familiar with what contracts mean on construction sites and how people on construction sites look at those contracts and honor them. And his total opinion was the contract gave them control, and Mr. Levin pretty much admitted that. We've got Mr. Shelsey who had control, but didn't understand anything about safety, and we don't have a safety superintendent. I would submit to the court, in light of all of that, that that presented a question to the jury. Unless your honors have some specific questions, I would rely on anything else in my brief. I think both sides' briefs, I thought, if not good, at least we were clear. Okay, thanks. Thank you. Okay, going to the 2616 issue. The amendment doesn't relate back simply because RAS may have known of the suit. The statute requires knowledge or constructive notice of a mistake in identity. It is not a mistake in identity if plaintiff knew of the existence and role of RAS within the limitation period. Now Krufsky held that there was a mistake in identity because Costa Cruz and Costa Crozier had similar sounding names, and plaintiff intended to sue one instead of the other. That's not what we have here. Here plaintiff did not mistakenly sue Wolfram Towers and RAS Wolfram instead of RAS Development. He sued all three. He continued his suit against these entities even after he knew of RAS and its role in the project. Plaintiff's alleged lack of knowledge about RAS is not a mistake in identity. The problem that I have comes right from the Krufsky case, and I'm going to quote it. Yeah. It says, quote, that a plaintiff knows of a party's existence does not preclude her from making a mistake with respect to that party's identity. I agree. Okay. I think that's hard waters for you to navigate here. No, I honestly, Judge, I don't think it is because if you look at Krufsky again, what you have there is you have two possible defendants. They sued one by mistake when they should have sued the other one. And what the plaintiff was saying was I sued A by mistake instead of B. Not what we have here. Here we have first sued against Wolfram and RAS Wolfram, and then after they know about RAS, which they did, and by the way, they knew all of this in 2003 and didn't act on it until 2006, they continue the lawsuit against all three. It's a different situation because they're not trying to substitute the party they sued by mistake with the right party. They're just suing all three. Another thing the counsel said that I was a little bit surprised about was he said, well, Krufsky is the last word. Krufsky is a word, and it is a case that you're going to have to look at. It is not the final word. It is not the last word. We have these decisions, we cited some of them in the reply brief, that talk about making the distinction between a plaintiff's claim that he didn't know about a party's involvement in a construction, you know, a role in the suit, and a real mistake in identity. Simply saying, I realize now I should have sued somebody else that I didn't sue before within the statute, is not a mistake in identity. 414 cases. Every case they cite they're talking about has much more extensive oversight than we have here. In the cases cited by the plaintiff that counsel is referring to, defendants required the employer to follow the defendant's safety directions or procedures, provide a copy of safety manuals, attend safety meetings, submit site-specific plans, and minutes of safety meetings for approval. We didn't do any of those things. We don't have to do any of those things. We can delegate that away as we did to Rockford. The cases I would ask you to look at, if you take nothing else away from what we're arguing today on this point, 414, if there's anything I want you to take a look at, look at Shaughnessy, which involved the same provision about, oh, we should have had somebody there on site as a superintendent. Cochran, Ross, all cases cited in our reply brief that make it very clear that simply saying there's an AIA provision out there that says we're supposed to do something doesn't mean they're reliable unless we affected the means and methods of the plaintiff's performance of the work. Now, I want to talk just a little bit about notice for a second because we talked a little bit about how the accident happened. First of all, the third floor is a restricted zone. It's control access because of the nature of the work and the fact that it's hazardous. Even Collins says, Shaughnessy's not supposed to be there while the work is in progress. They admitted that. Shaughnessy does do a walkthrough, but he's doing a walkthrough only to observe the progress of the work after meetings. He is not there when the work is being done. There was no evidence of a hazardous method of work existing long enough to charge RAS with notice and it could not be liable unless it had notice. Finally, with respect to incompetent testimony, I'm a little bit surprised that the plaintiff's position seems to be I can hire an expert, the expert can look at the contract, and then based on the contract, simply give the opinion that somebody's in charge of the work. How did that differ in substance from the way your expert went about testifying in this case? Didn't that expert look at the contracts? Wasn't he relying on those, Mr. Wyszynewski or whatever his name was? First of all, he's giving testimony as to, most of his testimony really dealt with whether or not there was a hazardous method of doing the work, first of all. I mean, he's there first and foremost to testify as to whether or not there was a hazard and whether we had notice of it because, look, our position has been based on, going back to the time we asked for summary judgment, it's a question of law. Summary judgment, direct to verdict, judgment OV, we're saying it's a question of law. I don't believe that our guy is testifying to a contractual interpretation. And you know what? I have not heard Plaintiff make that argument today. He's not saying I'm fighting fire with fire saying that it was a matter of contract. He hasn't made that argument. He seems to be saying, well, it really wasn't a contract interpretation, and if it was a contract interpretation, the question didn't make a whole lot of sense or he was basing it on his experience. The jury decides who is in charge of the work if the judge finds there's a question of fact for the jury to decide. But it's not for any witness who's hired by either party to give testimony about those issues, issues concerning 414 liability as far as who's in control and who's in charge. Coyne makes it about as clear as possible. It is not for an expert to testify that in his opinion somebody was in charge of the work, whether it's for the plaintiff or the defense. I'm sorry, but I just recalled from the record that he was asked, you know, that he did look at the contract and was asked some questions, perhaps not in the detail that the plaintiff's expert was, but was asked some questions about the meaning of various contract provisions. I mean, he may have testified to the fact that the way the AIA contracts operate, it's in stages. First you have the owner contracting with the general and then the general contracts with the sub. He may be testifying overall to matters of staging as far as the sequence, the sequencing. But he's not testifying, he's not testifying, oh, I looked at the AIA contract and based upon 5.31, it's one or the other. And that's exactly what you have here. I mean, come on, you have the plaintiff asking our client, Robert Levin, don't you have a duty to protect Jerry Maggie under the contract? I mean, why is he asking, when did you stop beating your wife? Well, he gave an answer that the question deserved, which was. Whatever the contract says, that's right. He was interpreting it and, you know, okay. But then they're using that to justify having their own expert testify. So, I mean, if that isn't bootstrapping, I don't know what is. Again, we are thankful for the opportunity to address the Court on a case that is important and that I think does raise issues that are important. And for all of the reasons, we ask you to either enter an order of dismissal, judgment OV, or award a new trial. Thank you very much. Thank you very much, Counsel. Good arguments on both sides. We'll take it under advisement, and you'll hear from us directly.